# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Nathaniel Brown, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 11 C 50193 |
| | ) | |
| Michael Randle, et al., | ) | |
| | ) | |
| *Defendants*. | ) | Judge Frederick J. Kapala |

## ORDER

Defendants' motion to dismiss [67] is granted. This case is closed.

## STATEMENT

Plaintiff, Nathaniel Brown, has sued defendants, Michael Randle, Nedra Chandler and Kathy Chavera, all of whom work for the Illinois Department of Corrections ("IDOC") in various capacities, for false arrest, false imprisonment, and deliberate indifference to his serious medical needs. Brown's claims break down into two broad categories: (1) that he was illegally arrested and detained for violating the terms of his mandatory supervised release despite the fact that the Prisoner Review Board ("PRB") had found him not in violation of those terms; and (2) that Chandler and Randle both knew of his serious heart condition and were deliberately indifferent to it. Currently pending before the court is defendants' motion to dismiss, which, for the following reasons, is granted.

## I. BACKGROUND

Because this case comes before the court pursuant to a motion to dismiss, the court accepts all allegations in the third amended complaint as true. Since the mandatory supervised release[1] claims and the deliberate indifference claims, while chronologically overlapping, have very little to do with each other, the court will set out the allegations making up each set of claims separately.

### A. The Turnaround Practice Allegations

According to the complaint, in 1994, Brown was convicted of two counts of aggravated criminal sexual assault and two counts of criminal sexual assault. Brown was sentenced to thirty years of incarceration and housed at Dixon Correctional Center ("Dixon"). Brown's projected released date was July 2009, after which he was required to serve three years of mandatory

---

[1] Although technically parole and mandatory supervised release are different things in Illinois, see Murdock v. Walker, No. 08 C 1142, 2014 WL 916992, at *1 n.3 (N.D. Ill. Mar. 10, 2014), the differences are irrelevant for the purposes of this order. For ease, the court will use the terms interchangeably.

supervised release.

The IDOC scheduled Brown's release date for July 10, 2009. However, on July 10, 2009, IDOC issued a "Parole Violation Report," which stated that Brown had violated his parole by refusing electronic monitoring and by failing to find an appropriate host site to which he could be released. Therefore, IDOC did not release Brown, but, instead, on July 15, 2009 transferred him to a reception and processing facility for a preliminary hearing before the PRB. On July 23, 2009, the PRB held the preliminary hearing and ordered Brown returned to Dixon pending a plenary hearing. On August 5, 2009, Brown was returned to Dixon.

On October 13, 2009, the PRB held the plenary hearing and found that Brown was not a violator. Nevertheless, on the same day, defendant Kathy Chavera, an IDOC employee, issued a second "Parole Violation Report" which indicated that Brown had violated the terms of his supervised release in the same way as before, by refusing the electronic monitoring agreement and by failing to have an adequate host site. The second violation report also references an IDOC warrant which Brown believes does not, and did not, exist. In any event, IDOC did not release him.

This practice of PRB review and ordered release leading to a new violation report is referred to as "cyclical incarceration" or the "turnaround practice." According to a letter attached to the complaint, the PRB has been aware of the IDOC's refiling of identical (or nearly identical) violation reports concerning host sites for offenders found guilty of sexual offenses notwithstanding the PRB's orders finding no violation since 2006, and had informed IDOC in 2006 that it would no longer docket the second or more violation report cases or consider them, since its orders are apparently leading nowhere. According to the letter from the PRB attached to the complaint, some inmates faced the turnaround practice eight or nine times without being released.

This is exactly what Brown alleges happened to him, albeit only once because the PRB had already started refusing to docket subsequent reports. Following the second report, he was not given the statutorily required preliminary or plenary hearing on the alleged violations of his mandatory supervised release. Instead, he remained at Dixon until he was fully released on January 11, 2011.[2]

### B. Deliberate Indifference Allegations

Brown was incarcerated in 1994 at the age of fifty. In 2006, Brown began suffering from recurring severe chest pains. In early 2007, Brown was taken to KSB Hospital for two evaluations of his chest. While there the first time, defendant Chandler, the warden of Dixon, allegedly came to his room and informed him that she believed he was faking his ailment. At the second appointment, Brown was transferred to University of Illinois Hospital in Chicago ("UIC"), where it was determined that he needed immediate triple bypass surgery. On April 16, 2007, the triple bypass was performed and Brown was informed that his previous severe chest pains were heart attacks.

---

[2] The complaint alleges that Brown's mandatory supervised release was ended on January 2011, although it was considerably before the three years would have elapsed from his projected release date of July 2009. Although neither party has addressed this issue and the complaint does not explain the discrepancy, the court presumes that the eighteen-month difference was caused by Illinois' day-for-day good time credits in effect at the time of Brown's sentencing. See 730 ILCS 5/3-6-3(a)(2.1).

When Brown was returned to Dixon on April 21, 2007, he was transferred from general population to the Health Care Unit ("HCU"), which had immediate access to the medical facilities at Dixon. It also meant that his commissary purchases, barber services, and meals were delivered to him, and that he did not have to walk across the facility several times a day to receive his medicine. Additionally, HCU was less crowded and the inmates in the HCU were older and less prone to violence than those in general population. Finally, the HCU was air conditioned, while general population was not.

In early 2008, Brown began to again experience chest pains. He was returned to UIC, where he believes he received his first arterial stent surgery to alleviate the coronary blockage. In October 2008, Brown was again taken to UIC for chest pains, where he was examined and told to return in six months for another examination. According to Brown, the pain continued but he was not returned to UIC for a further examination during the remainder of 2008 or the entirety of 2009.

In July 2009, Brown was transferred out of Dixon for his preliminary hearing before the PRB. When he was returned to Dixon in August 2009, he was not returned to the HCU, but was, instead, placed in general population. In September and October 2009, Brown met with Dr. Mesrobian at Dixon and complained about knee and chest pain, and reminded Mesrobian that he was supposed to return to UIC. He also requested a transfer back to the HCU. Mesrobian refused to schedule the UIC appointment and did not transfer Brown.

On October 14, 2009, Brown filed an emergency grievance concerning Mesrobian's medical care. Chandler, who reviews emergency grievances to determine if they require an expedited procedure, determined that Brown's grievance was not an emergency and thus did not provide the expedited procedure. Instead, on January 15, 2010, Brown's grievance officer determined that the grievance was meritless because Brown's treatment was being reviewed and HCU placement was based on inmate condition severity, thus he recommended it be denied. On January 22, 2010, Chandler concurred. Brown's medical grievance was then appealed to defendant Randle, the director at IDOC, who determined that the grievance had been handled appropriately.

On May 13, 2010, Brown was returned to UIC on account of chest pains. The physicians at UIC determined he needed immediate chest surgery, which was performed the next day. According to Brown, this was his second arterial stent surgery. When Brown was returned from UIC on May 15, 2010, still bearing "open wounds" from the surgery according to the complaint, he was placed in general population rather than in HCU. Brown complained to Dixon's physician, Dr. Carter (Mesrobian had left by this point), and Carter indicated that he believed Brown should be assigned to the HCU but that Chandler was against the assignment.

On June 24, 2010, Brown was reassigned to HCU. In October 2010, Brown suffered from a third set of recurring chest pains and requested to be returned to UIC for care.[3] Despite those requests, Brown was not returned to UIC prior to his release in January 2011. Shortly after his release, Brown had two more chest surgeries to alleviate coronary blockage.

---

[3]The complaint also indicates that in October 2010, Brown requested to be reassigned to HCU but was denied, despite the fact that the previous paragraph clearly states "On June 24, 2010, Brown was finally reassigned to live in HCU."

3

### C. Procedural Background

Based on the foregoing facts, Brown filed his initial pro se complaint on July 1, 2011. In response to his motion to proceed in forma pauperis, this court issued an order that Brown show cause why he should not be required to pursue his claims in a class action suit which was pending before the Eastern Division of this court, James v. Murdock, Jr., et al. v. Roger E. Walker, et al., No. 08-cv-01141 (N.D Ill. originally filed Feb. 25, 2008) ("Murdock Case"). Brown responded by filing the first of a series of amended complaints with a letter attached which stated only that "Plaintiff knowingly opt out [sic] any Class Action, and seeks to pursue his claims separately."

The complaint has since been amended several more times, with the operative complaint being the third amended complaint filed by Brown's retained counsel. In the third amended complaint, Brown brings the following counts, all pursuant to 42 U.S.C. § 1983: false arrest against Chavera based on the October 13, 2009 violation report (Count I); false imprisonment against Chandler and Randle based on the same violation report (Counts II & III); and deliberate indifference to a serious medical need in violation of the Eighth Amendment's ban on cruel and unusual punishment against Chandler and Randle (Counts IV & V). Defendants have moved to dismiss all of Brown's claims for failure to state a claim.

There is one additional procedural consideration. As mentioned earlier, a group of inmates caught in the turnaround practice filed a class action suit challenging that process in the Murdock Case. After the motion to dismiss in this case was fully briefed, the Murdock Case came to a close, with the court granting summary judgment in favor of the various IDOC defendants on all of the § 1983 claims based on the same practice complained of here. Class counsel did not appeal that order and time to appeal has lapsed, therefore the order has become final.

## II. ANALYSIS

When deciding a defendant's motion to dismiss, a court accepts all of the well-pleaded allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Killingsworth v. HSBC Bank Nev., N.A., 507 F.3d 614, 618 (7th Cir. 2007). Under the Federal Rules, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted). In analyzing whether a complaint has met this standard, the "reviewing court [must] draw on its judicial experience and common sense." Id. at 679.

### A. The Turnaround Practice Claims (Counts I-III)

The first three claims all rise and fall with the same issue: whether the turnaround practice caused Brown to be arrested or restrained after October 13, 2009 in violation of the Fourth Amendment. Before addressing that question, however, the court must first address the threshold question it raised originally in the show cause order following Brown's initial complaint, namely whether he opted-out of the Murdock Case or whether he is ultimately bound by the dismissal in that case. Initially, Brown clearly falls within the class as defined by the court. See Murdock v. Walker, No. 08 CV 1142, slip op. at 3 (N.D. Ill. June 7, 2011). Furthermore, the Murdock Case class was

certified under Federal Rule of Civil Procedure 23(b)(2), see Murdock, slip op. at 3, which does not have an opt out provision. See generally Fed. R. Civ. P. 23. Indeed, a judgment against a class certified based on Rule 23(b)(2) binds all members of the class, regardless of their desire to opt out. See Johnson v. Meriter Health Servs. Emp. Ret. Plan, 702 F.3d 364, 370 (7th Cir. 2012). Thus, Brown is bound by the determination against the class in the Murdock Case and Counts I-III must be dismissed. But see Wal-Mart Stores, Inc. v. Dukes, ___ U.S. ___, 131 S. Ct. 2541, 2557-2560 (2011) (holding that many requests for damages are not properly certified under Rule 23(b)(2), which typically deals with injunctive or declaratory relief).

Nevertheless, regardless of whether Brown is bound by the Murdock Case or not, the court finds that Counts I-III fail to state a claim for false arrest or imprisonment. A normal citizen, possessing an unlimited interest in his liberty, can typically only be lawfully seized or imprisoned pursuant to the Fourth Amendment's requirements if the government can prove it has probable cause to seize or imprison. See Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 713-14 (7th Cir. 2013). Once granted supervised release, as Brown was here, a more limited liberty interest attaches to the parolee's freedom. See Domka v. Portage Cnty., Wis., 523 F.3d 776, 781 (7th Cir. 2008) (noting that it is "established that an inmate on parole has a liberty interest in retaining that status"); see also Morrissey v. Brewer, 408 U.S. 471, 482 (1972) ("We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment."). Because this liberty interest is more limited than a normal citizen's liberty interest, however, a parolee can be seized and imprisoned anytime there is reasonable suspicion that he has broken one of the terms of his release.[4] See Knox v. Smith, 342 F.3d 651, 657 (7th Cir. 2003) ("Accordingly, we find that a seizure of [a parolee] based on only reasonable suspicion would satisfy the Fourth Amendment standard.").

The documents attached to the complaint make it clear that Brown had, as a provision of his mandatory supervised release, a requirement that he have a suitable home site and that he did not, in the opinion of the IDOC, have one. Here, there is no allegation in the complaint which states that the IDOC's conclusion that Brown lacked an adequate host site was false. Even the finding by the PRB that Brown was "not . . . a violator" does not indicate that the IDOC's conclusion was false, indeed the same order stated that it was "waiting on [a] response for [a] prospective host cite," meaning that Brown clearly lacked a suitable home site even while proceeding before the PRB.[5] Accordingly, based on the face of the complaint, it is clear that IDOC had reasonable suspicion to suspect he had violated the terms of his mandatory supervised release, and thus could arrest and

---

[4]Brown notes throughout his argument that the October 13, 2009 violation report was unsigned and unsworn, despite having a space for a signature and oath. However, Brown has not explained how this omission affects the reasonable suspicion analysis or what right he has to a signed violation report rather than an unsigned one.

[5]The court notes that the PRB making a "not . . . a violator" finding and ordering a release notwithstanding the lack of an adequate host cite appears to have been a regular practice, one which largely precipitated the turnaround practice. See Murdock, 2014 WL 916992, at *10.

imprison him based on those violations.

Brown argues, however, that several facts complicate this otherwise straightforward analysis. First, when Chavera issued the October 13, 2009 violation report, which came the same day as the PRB's review of the previous essentially identical violation report, she already knew that the PRB had determined that Brown was "Found not to be a violator" and thus she could not have reasonably relied on his host site's allegedly unacceptable nature to file another violation report. Although initially compelling, Brown's argument is flawed because it is based on a misunderstanding of the relationship between the IDOC and the PRB. This relationship was explained by the court in the Murdock Case:

> The Illinois legislature has established the framework under which an inmate's parole release is determined. The Prison Review Board ("PRB") is responsible for establishing release dates from prison for parolees, setting the conditions for parole release, and determining whether a violation of a condition should result in a revocation of one's parole. 730 ILCS 5/3-3-1. The IDOC retains custody of all prisoners released on parole and is charged with supervising those persons during their release "in accord with the conditions set by the [PRB]." 730 ILCS 5/3–14–2. The IDOC is independent of the PRB, though it is required to assist eligible prisoners and report its "efforts and findings" to the PRB so that the PRB may consider the information in its release decisions. 730 ILCS 5/3-3-1, 5/3-14-2.
>
> . . . .
>
> . . . The Plaintiffs' sole basis for their claim is they believe the Defendants are usurping the PRB's release authority by finding violations even after the PRB has said the sex-offender parolees should be released. R. 224 at 8. This might be true to some extent–e.g., IDOC is not releasing prisoners even though they have a valid release order–but it is not in violation of Illinois law. The Plaintiffs completely ignore 20 Ill. Admin. Code § 1610.110, which provides:
>
>> a) When an order for release on parole is entered, it shall not be effective and the applicant shall not be released until the Office of Adult Parole Services or Family and Youth Counseling Services has satisfied itself that suitable arrangements have been made for:
>>
>>> 1) The applicant's gainful employment and/or education or training programs and for a proper and approved residence.
>>>
>>> 2) The chief administrative officer of the institution shall have the authority to hold the prospective parolee until these arrangements have been approved
>
> The PRB determines who is entitled to be released and who should have their parole revoked, 730 ILCS 5/3-3-7, but it is not vested with the authority to force IDOC to release someone who IDOC does not believe has a suitable housing location. The Plaintiffs direct us to no such authority, and the Court has been unable

to find any. . . . The Defendants did not create the overall structure and have simply followed the law, which thereby caused the turnaround practice.

Murdock v. Walker, No. 08 C 1142, 2014 WL 916992, at *2, *9-10 (N.D. Ill. Mar. 10, 2014) (alterations and emphasis omitted). As the court went on to state,

The main problem with the scheme is that the PRB issues a release order before IDOC has the opportunity to verify that the parolee's host site is permissible or, conversely, that the PRB issues a release order at the revocation hearing despite the IDOC's prior determination that the parolee lacked an appropriate host site. The scheme may be constitutional, but it also allows two separate authorities to make valid, yet contradicting determinations. The resolution of this problem requires legislative rather than judicial action.

See id. at *11 n.14. Therefore, the IDOC did not lack reasonable suspicion that Brown was in violation of the terms of his mandatory supervised release despite the PRB's ruling on a previous functionally identical violation report that he was not a violator. Put simply, under the administrative scheme in Illinois, PRB's ruling on a previous report does not affect IDOC's finding on any subsequent report, even where the same issue is involved.[6] See id. at *10 ("The PRB apparently wanted sex-offender parolees released with some conditions, regardless of proper housing, in order to improve the parolees' chances for success upon completion of their entire criminal sentence when they are released with no conditions. While this might be a legitimate goal, Illinois law does not allow for that. The housing conditions must be satisfied or an inmate cannot be released." (citations omitted)).

Brown also points out that he was not provided the mandatory preliminary or final revocation hearings on the October 13, 2009 violation report. The court accepts this fact as true, but it does not alter the result. As the court in Murdock pointed out, only the PRB has the authority to hold the preliminary or plenary hearings. See id. at *9 ("Undeniably, as is the case with preliminary hearings, Illinois law instills the PRB with the power to conduct a complete revocation hearing, not the IDOC."). Here, however, the defendants are all members of the IDOC, and thus without the authority to grant Brown what he allegedly lacked.

Thus, defendants had reasonable suspicion to seize and imprison Brown and the reality of the turnaround practice does nothing to undermine that fact. Accordingly, Counts I-III fail to state a claim.

Even if this were not the case, however, the court would still be required to dismiss these claims as barred by qualified immunity. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (2013) (quotation marks omitted). In order to overcome defendants' qualified immunity, Brown bears the "burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could

---

[6] Brown has not requested a decision from this court as to the constitutionality of the state's administrative scheme, and thus this court renders no opinion on the matter.

7

have thought he was acting lawfully." Abbott, 705 F.3d at 723-24. As set out above, defendants were actually following Illinois' administrative structure correctly, albeit with consequences which adversely affected Brown. Brown has not identified any closely analogous case or persuaded this court that no reasonable state actor would have thought that their actions were lawful where they were following Illinois law. For each of the foregoing reasons, the motion to dismiss is granted as to Counts I-III.

All of that being said, this court joins its voice to the court in the Murdock Case. The court urges the Illinois Legislature to investigate and remedy the problems identified in Murdock which permit and perpetuate this situation.

### B. Deliberate Indifference (Counts IV-V)

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" such that a prisoner may bring a cause of action against a prison official. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (quotation marks omitted). The Seventh Circuit has distilled the language from Estelle into a two-part test, requiring a prisoner to allege (1) an objective component, a serious medical condition, and (2) a subjective component, an official's deliberate indifference to that condition, to set out a claim for deliberate indifference under § 1983. See Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012). Here, defendants do not dispute that Brown's allegations concerning his heart and chest problems qualify as a serious medical condition, and instead they focus their arguments on the subjective component.

To satisfy the subjective element of a deliberate indifference claim, a plaintiff must allege that "the official [had] subjective knowledge of the risk to the inmate's health, and the official . . . disregard[ed] that risk." Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010). To plausibly state a claim for deliberate indifference, Brown's allegations must raise a reasonable probability that defendants' actions were "so far out of bounds that [their treatment] was blatantly inappropriate." King v. Karmer, 680 F.3d 1013, 1019 (7th Cir. 2012) (quotation marks omitted). Indeed, even gross negligence is insufficient to meet the necessary standard. Id. at 1018. Nevertheless, Brown is not required to allege "intentional harm" or "that he was literally ignored." Id. at 1018-19 (quotation marks omitted). This case is further complicated because Brown was under the care of medical staff and neither Randle nor Chandler are medical professionals. As non-medical prison officials, they were permitted to rely on the medical experts unless it would be evident to a lay person that a prisoner is receiving inadequate or inappropriate care. See Johnson v. Doughty, 433 F.3d 1001, 1010-11 (7th Cir. 2006).

The allegations against Chandler are that (1) she was the head of Dixon, (2) she denied Brown's medical grievance emergency status and then concurred with the grievance officer's denial of the grievance, and (3) she prevented Brown's return to the HCU from August 2009 until June 2010. The allegations against Randle are thinner, just that he (1) was the head of IDOC generally and (2) denied Brown's medical grievance after Chandler did.

As to the fact that both Randle and Chandler held supervisory positions, this fact is irrelevant without something more, as § 1983 claims require personal involvement. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic

8

organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. Burks's view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, <u>and for that matter the Superintendent of Prisons and the Warden of each prison</u>, is entitled to relegate to the prison's medical staff the provision of good medical care." (emphasis added)). Similarly, under the facts alleged here, the denial of the grievance by both defendants is insufficient to state a claim for deliberate indifference. The grievance officer found that, after investigating Brown's grievance with the health care nursing director, his request for cardiology treatment at UIC was being reconsidered, that his knee was now being treated, and that HCU placement was based on severity of an offender's condition. Furthermore, he noted that the grievance process lacked the authority to mandate treatment plans to licensed medical professionals and suggested another route (complaining to the Office of Health Services) which could exercise such control. After that determination, he found that Brown had sufficient access to healthcare and recommended that the grievance be denied. Chandler concurred, as did Randle.

The Seventh Circuit has noted that a complaint examiner who "routinely sent each grievance to the shredder without reading it . . . [o]r who intervened to prevent the medical unit from delivering needed care <u>might</u> be thought to be liable" for deliberate indifference. Id. (emphasis added). Chandler's and Randle's reliance on the grievance officer's recommendation following an investigation into Brown's medical treatment can hardly be put on par with simply shredding the grievances without reading them or active interference. See Greeno v. Daley, 414 F.3d 645, 657 (7th Cir. 2005) (noting that, in the summary judgment context, handling an appeal from a non-indifferent complaint examiner is not itself indifferent unless something suggested the individual "shirked his duty in any way or failed to appropriately handle the claims"). Thus, neither can be liable as non-medical personnel for their failure to intervene in medical decisions on this basis, either. See Burks 555 F.3d at 596 ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service.").

That is sufficient to dismiss Count V against defendant Randle entirely and leaves only Chandler's alleged interference with Brown's placement in the HCU. The complaint alleges that Dr. Carter informed Brown that he believed Brown should be transferred back to HCU, but that Chandler was against said placement. Brown argues that this, coupled with the allegation that Chandler told him in early 2007 before the UIC doctors diagnosed him as needing triple bypass surgery that she believed he was faking, is sufficient to set out a claim for deliberate indifference. Although non-medical staff's interference with a treatment can be the basis of a deliberate indifference claim, see Estelle, 429 U.S. at 105 (noting that non-medical personnel can be liable for "intentionally interfering with treatment once prescribed"), the allegations here are insufficient to set out a plausible cause of action against Chandler on even this basis. Specifically, although there are allegations that the assignment to HCU would have been more comfortable on account of HCU's air conditioning, less crowded nature, and easy access to daily medications, there is no allegation which suggests that assignment to HCU was a treatment of any kind, or that, if it was, he was entitled

to it or prescribed it by Carter (the allegation merely states that Carter informed Brown that he "believed" Brown should be in HCU). While at Dixon, and ultimately under Chandler's authority, Brown alleges that he was provided three surgeries at UIC, two off-site appointments at KSB Hospital, four off-site appointments at UIC, daily medication, and an unspecified-but-apparently-significant number of on-site doctors' visits all on account of his heart condition. Brown may not have gotten the treatment he wanted—additional surgery or treatment at UIC and an earlier transfer back to HCU—or even perhaps the best treatment for his condition, but he was not guaranteed either by the Eighth Amendment. See Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]. The defendants have taken those measures."); see also Holloway v. Del. Cnty. Sheriff, 700 F.3d 1063, 1073 (7th Cir. 2012) ("[A] prisoner is not entitled to receive unqualified access to healthcare. Instead, prisoners are entitled only to adequate medical care. There is not one proper way to practice medicine in prison . . . ." (citations and quotation marks omitted)); Rodriguez v. Bakke, 84 F. App'x 685, 687 (7th Cir. 2003) ("Inmates are not entitled to their preferred course of treatment."). Thus, on this ground, his complaint also fails to state a claim.

### III. CONCLUSION

The complaint fails to state a claim. The motion to dismiss is granted and the complaint is dismissed. Plaintiff has not requested an opportunity to amend his complaint nor attached a proposed amended complaint, see This Court's Standing Order on Motions dated September 14, 2010, available at http://www.ilnd.uscourts.gov/home/Judges.aspx ("In the case of a Rule 12(b)(6) motion, if a plaintiff wishes to retain an opportunity to amend the complaint following an adverse decision of this court, plaintiff should request the court's leave to replead in its response to defendant's Rule 12(b)(6) motion and inform the court of how, consistent with the requirements of Rule 11, it would amend the complaint. If a plaintiff fails to request such relief in its response, and this court finds in favor of the defendant, the dismissal will be with prejudice unless the court determines there are exceptional circumstances which would warrant leave to amend." (citations omitted)), and thus this case is closed.

Date: 6/5/2014

ENTER:

_____

FREDERICK J. KAPALA
District Judge